# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| FALCONER PHARMACY, INC., HALLIDAY'S & KOIVISTO'S PHARMACY, RUSSELL'S MR. DISCOUNT DRUGS, INC., and SOUTHSIDE PHARMACY, INC., on behalf of themselves and all others similarly situated, <br><br>      *Plaintiffs*, <br><br> v. <br><br> AUROBINDO Pharma USA, Inc., CITRON Pharma, LLC, HERITAGE Pharmaceuticals, Inc., TEVA Pharmaceuticals USA, Inc., Jeffrey A. GLAZER, and Jason T. MALEK, <br>      *Defendants*. | CASE NO. <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Falconer Pharmacy, Inc., Halliday's & Koivisto's Pharmacy, Russell's Mr. Discount Drugs, Inc., and Southside Pharmacy, Inc. ("Plaintiffs"), individually and on behalf of a class of all those similarly situated, bring this class action for claims under federal and state antitrust and consumer protection laws and the common law of unjust enrichment to recover damages and to obtain injunctive and equitable relief for the injuries they and others similarly situated have sustained against Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., Teva Pharmaceuticals USA, Inc., Jeffrey A. Glazer, and Jason T. Malek (collectively "Defendants"), arising from their conspiracy to fix, raise, maintain and stabilize the prices of the generic prescription medication glyburide ("glyburide") in the United States during the period from April 1, 2014 through December 31, 2015 (the "Class Period"), in the states identified below, and to allocate markets and customers for glyburide products during the same time period. All allegations herein are based on review of publicly available

documents, counsel's investigation, Plaintiffs' personal knowledge as to themselves, and information and belief.

## NATURE OF THE ACTION

1.    Hundreds of millions of adults and children in this country rely on generic drugs to overcome injuries and illnesses and to stay healthy. For many, filling a prescription at a pharmacy is as essential as buying food. Congress has passed legislation recognizing that competition in the generic drug industry is necessary to keep prices affordable and ensure access to these staples.

2.    Unfortunately, generic drug manufacturers have improperly taken advantage of their market position to hike prices far above competitive levels. This case involves glyburide, an oral anti-diabetic medication prescribed to treat high blood sugar caused by Type 2 diabetes. Generic versions of glyburide have been on the market since the mid-1990s, and until April 2014, the price of glyburide was relatively stable. During the Class Period, however, glyburide has seen unprecedented and astounding price increases. Between April 1, 2014 and December 31, 2015, the price of glyburide increased to 200% of its prior prices.

3.    In October 2014, Members of Congress and the Department of Justice each launched investigations into the sharp price increases for various generic drugs. Attorneys General of twenty states also pursued leads, obtained communications records, and recently filed an enforcement action in the U.S. District Court for the District of Connecticut in which they disclosed (in redacted form) emails, calls and meetings between Defendants to fix prices. Twenty additional states joined the case on March 1, 2017. Attorney General of Connecticut George Jepsen noted: "[W]e have evidence of widespread participation in illegal conspiracies across the generic drug industry." The complaint acknowledged that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the

2

aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate. When communications were made in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."

4.     Top executives at defendant Heritage have already admitted parts of the scheme. On January 9, 2017, CEO and Chairman Jeffrey Glazer and Senior Vice President Jason Malek pleaded guilty to federal charges. Each admitted that Heritage conspired to raise prices and made illegal agreements with co-conspirator manufacturers to allocate customers in the glyburide market and in other drug markets.[1]

5.     A report from the legal news service *mlex* indicated that DOJ had received assistance from a privately-held pharmaceutical company that came forward as a leniency applicant in the summer of 2016: "While the Justice Department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations." A leniency applicant is proof of conspiracy, because a company cannot apply for the DOJ's program unless it has culpable facts to confess. The investigations remain underway.

6.     Although the full extent of price-fixing in the generic drug industry is not yet known, the effects of price spikes are clear to pharmacies and their customers. Some patients who pay a large percentage of their drug costs out-of-pocket may forgo treatment or ration their dosages.   For other patients who have better health care coverage, pharmacies are forced to purchase drugs at inflated prices while reimbursement rates lag or do not adjust accordingly. In making sure that customers get their medication, pharmacies suffer a loss. Further losses result because medications expire, so pharmacies cannot always purchase when prices are low and cannot keep drugs in stock indefinitely. Finally,

---

[1] *See* Tr. of Plea Hearing, *United States v. Glazer*, 16-cr-506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

independent pharmacies often absorb losses rather than impose a price hike on customers, especially when the pharmacist understands a person's health needs and financial problems. This action seeks to make Defendants responsible to independent pharmacies for the damage of their anticompetitive behavior in the glyburide market.

7.      Plaintiffs seek to certify two classes. The first class (the "Injunctive Class") is a national injunctive class of independent pharmacies in the United States and its territories who indirectly purchased glyburide products during the Class Period.

8.      The second class (the "Damages Class") includes all independent pharmacies who indirectly purchased glyburide products during the Class Period, in certain states identified herein and in the District of Columbia.

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and by other class members by reason of Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  This action is also instituted under the antitrust, consumer protection, and common laws of various states.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, Section 16 of the Clayton Act (15 U.S.C. §26), because this action arises under the federal antitrust laws. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue in proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, a portion of the affected interstate trade and commerce described below was carried out in this District, and it is likely that acts in furtherance of the alleged conspiracy

took place here. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here.

12.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold glyburide throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

13.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce. During the Class Period, Defendants sold substantial quantities of generic glyburide in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

14.     Defendants' anticompetitive conduct has had and continues to have substantial intrastate effects in that, *inter alia*, generic glyburide products have been and are offered at higher prices to pharmacies inside each state than they would have been or would be but for Defendants' conduct. The complete lack of availability of competitively priced generic glyburide products directly impacts and disrupts commerce for pharmacies within each state. Defendants' conduct has had, and continues to have, a direct, substantial and reasonably foreseeable effect on both interstate commerce and on intrastate commerce in each state, and it will continue to do so if not constrained by the Court.

## **PARTIES**

15.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is an independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased Defendants' generic glyburide products

at supracompetitive prices during the Class Period, and was thereby injured. The inflated prices of the drugs contributed to Falconer Pharmacy's expiration, reimbursement, and below-cost sales losses.

16.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida.  Halliday's has served the Jacksonville community for over 50 years.  Halliday's indirectly purchased Defendants' generic glyburide products at supracompetitive prices during the Class Period, and was thereby injured.  The inflated prices of the drugs contributed to Halliday's expiration, reimbursement and below-cost sales losses.

17.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was an independent pharmacy located at 334 Depot Street, in Lexington, Mississippi. From the time of its opening in February 1986, until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic glyburide products at supracompetitive prices during the class period, and was thereby injured. The inflated glyburide prices contributed to Russell's expiration, reimbursement, and below-cost sales losses.

18.     Plaintiff Southside Pharmacy, Inc. ("Southside") is an independent pharmacy located in Jamestown, New York. Southside Pharmacy indirectly purchased Defendants' generic glyburide products at supracompetitive prices during the Class Period, and was thereby injured. The inflated prices of the drugs contributed to Southside's expiration, reimbursement, and below-cost sales losses.

19.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a private corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6 Wheeling Road, Dayton, New Jersey. Aurobindo is a direct, wholly-owned subsidiary of Aurobindo Pharma Limited, an Indian corporation. Aurobindo has a partnership with Citron Pharma LLC in which Aurobindo manufactures glyburide that Citron markets and sells under its trade dress.  During the Class Period, Aurobindo conspired with Citron and others to fix and raise the prices of glyburide sold in the United States.

20.      Defendant Citron Pharma, LLC. ("Citron") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey.  In December 2016, ACETO Corporation acquired the generic products division and related assets from Citron for $429 million.  During the Class Period, Citron sold generic glyburide to customers in this District and other locations in the United States.

21.      Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 12 Christopher Way, Suite 300 Eatontown, New Jersey.  During the Class Period, Heritage sold generic glyburide to customers in this District and other locations in the United States.

22.      Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Pennsylvania-based corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.  Teva is a subsidiary of Teva Pharmaceuticals Industries Ltd., an Israeli company with its principal place of business at 5 Basel Street, Petach Tikva, Israel 49131.  Teva manufactures, markets, and sells generic pharmaceutical products.  During the Class Period, Teva sold generic glyburide to customers in this District and other locations in the United States, and conspired with others to fix and raise prices.

23.      Defendant Jeffrey A. Glazer ("Glazer") is an individual residing in Marlboro, New Jersey.  Glazer is an attorney licensed by the New Jersey State Bar (Attorney ID# 031701998).  Glazer was the Chief Executive Office and Chairman of Defendant Heritage.  During the Class Period, Glazer, in his capacity as CEO of Heritage, conspired with others to fix and raise the price of glyburide sold in this District and other locations in the United States.

24.      Defendant Jason T. Malek ("Malek") is an individual residing in Ocean, New Jersey.  Malek was Senior Vice President, Commercial Operations, and later President, of Defendant Heritage.  During the Class Period, Malek, in his capacity of VP Commercial Operations of Heritage, conspired

with others to fix and raise the price of glyburide sold in this District and other locations in the United States.

25. Whenever in this complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

26. All acts alleged in this complaint to have been done by Defendants Aurobindo, Citron, Heritage, and Teva were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

27. Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

28. At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## **FACTUAL ALLEGATIONS**

**The role of independent pharmacies**

29. Illegal price hikes ricochet throughout the U.S. economy, and independent pharmacies represented by Plaintiffs suffer part of the damage. There are approximately 22,000 independent pharmacies in the United States, as contrasted with chain drug stores such as CVS or Walgreens,

supermarket drug stores, and mass merchandiser drug stores such as Wal-Mart. Independent pharmacies fill over a billion prescriptions for U.S. consumers each year.

30.    Independent pharmacies obtain drugs by purchasing from a drug wholesaler such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. Independent pharmacies have no meaningful ability to negotiate these acquisition costs. When a drug is dispensed to a patient/customer, the pharmacy is often reimbursed by the patient's health plan. But the insurer or health plan does not simply pay the pharmacy the actual cost of acquisition. Instead, insurers and health plans publish reimbursement rates for each drug, based on average costs of acquisition for a certain time period. These schedules often lag behind the spikes in drug costs caused by Defendants' price-fixing activity, so pharmacies are reimbursed at lower rates even while their acquisition costs have increased. In providing essential medications to their communities, independent pharmacies suffer a loss. In short, one way pharmacies are injured is because the reimbursements do not cover the acquisition cost.

31.    In an April 2016 study, university researchers collected a sample of 73 generic drugs and compared the acquisition costs at one pharmacy location to the reimbursement costs available through various reimbursers. The results were as follows:

| Reimbursement through: | Pharmacy's total acquisition cost | Pharmacy's total reimbursement amount | Overall loss |
|---|---|---|---|
| Optum | $ 8,063 *(70 of 73 drugs)* | $ 6,957 | – $ 1,105 |
| CVS/Caremark | $ 4,899 *(63 of 73 drugs)* | $ 4,649 | – $ 250 |
| Medco | $ 7,912 *(67 of 73 drugs)* | $ 7,675 | – $ 237 |
| Humana | $ 5,024 *(67 of 73 drugs)* | $ 4,601 | – $ 423 |

32.    Independent pharmacies have no meaningful ability to negotiate these reimbursement rates. Pharmacies rely on various liaison entities known as "pharmacy services administrative organizations" ("PSAOs"), and "pharmacy benefit managers" ("PBMs") who work to set the reimbursement rates paid by a patient's insurance. There are not many PSAOs – only about twenty

nationwide, with the five largest representing the majority of independent pharmacies that contract with a PSAO. Overall, the lack of tailored negotiations between independent pharmacies and the third-party payors results in bulk contracts with standardized terms, including standardized formulas for reimbursement rates.

33.    Trade publications report the losses suffered by independent pharmacies. "There isn't a single day in the pharmacy where we don't dispense a prescription in which the reimbursement is below cost," noted Hashim Zaibak of Hayat Pharmacy in Brookfield, Wisconsin. The lag in reimbursement "eventually trickles down into our total revenue, our ability to stay in business and our ability to help the people in our community," said Joe Moose of Moose Pharmacy in Concord, North Carolina.

34.    Independent pharmacies also suffer losses from higher prices because medications expire on the shelf. Naturally, the higher the inflated cost of the medication, the larger the loss when the drug expires or must be sold at a loss to discount purchasers. Finally, independent pharmacies often sell at a loss to customers who pay out of pocket.

**Market for generic glyburide**

35.    Glyburide is an organic compound that helps diabetic patients control their hyperglycemia (high blood sugar levels) by causing beta cells in the pancreas to release insulin. Branded versions of glyburide have been on the market for over 30 years. Generic versions have been available since the mid-1990s. The market for generic glyburide is mature, so manufacturers must compete on price in order to gain market share.

36.    Generic drug manufacturers that currently manufacture or sell generic versions of glyburide include Aurobindo, Citron, Heritage, Teva, CorePharma, LLC (now part of Impax Laboratories, Inc.), TruPharma LLC (in a partnership with PharmaDex Inc.), and Zydus Pharmaceuticals USA Inc. The latter three only entered the glyburide market recently. CorePharma received FDA

approval for its glyburide product in September 2015; TruPharma's glyburide product received FDA approval in April 2016; and Zydus's glyburide product received FDA approval in May 2016.

37.     Accordingly, during the Class Period, the primary competitors in the glyburide market were Defendants Aurobindo, Citron, Heritage, and Teva. Plaintiffs will request leave to amend if the continuing investigations reveal evidence of agreements with additional conspirators.

**Evidence of a glyburide conspiracy**

38.     Defendants are in possession of email and phone records that constitute direct evidence of their conspiracy to fix and raise the prices of glyburide, rig bids for glyburide, and allocate glyburide customers.  The evidence indicates that Malek and Glazer originally proposed the idea of illegal price coordination between Heritage and its competitors, and that Defendants Aurobindo and Teva later accepted this proposal.

39.     During a conference call with Heritage employees on April 22, 2014, Malek discussed drugs that Heritage had targeted for price increases, including glyburide, and highlighted the need to coordinate pricing with Defendants Aurobindo and Teva, who were the only glyburide competitors at that time.

40.     After the call, Malek directed members of the Heritage sales team members to immediately contact their counterparts at Aurobindo and Teva in order to reach agreement on the price increases for glyburide and other drugs. Different Heritage employees were responsible for communicating with different competitors.

41.     Malek himself communicated with Teva, which competed with Heritage in the glyburide market.  Malek made direct contact with a female representative at Teva to discuss price increases for glyburide and other drugs. Before encouraging Heritage employees to rig prices, Malek had already spoken with this woman at Teva on April 15, 2014, for approximately 18 minutes. Ultimately, Malek

and Teva's representative reached an agreement to raise prices on glyburide. The Teva employee's identity is known to the Attorney General of Connecticut.

42.    Defendants Malek and Glazer directed Heritage employees to communicate with their competitors and obtain agreements to raise prices for Glyburide, and other drugs. These efforts were memorialized in several emails Malek and Glazer sent imploring Heritage employees to reach agreements with competitors as soon as possible. For example, on April 28, 2014, Malek emailed a Heritage employee regarding the status of discussions with Aurobindo.

43.    On April 29, 2014, Glazer sent an email to the same Heritage employee requesting further information. Malek sent a follow-up email on April 30th requesting an update.

44.    On May 9, 2014, Heritage held a teleconference with its employees to discuss their plans to increase prices for glyburide, among other drugs.

45.    One week later, a Heritage employee met in-person with several competitors while attending the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"). The Heritage employee and her counterpart at Aurobindo agreed that both companies would raise the price of glyburide. On May 15, 2014 the same employee emailed Malek confirming this agreement.

46.    On June 23, 2014, Heritage employees met to discuss the percentage amount of price increases they would seek for certain generic drugs, including glyburide, and the strategy for implementing those price increases. Glyburide was slated for a 200% price increase.

47.    Over the next several weeks, Heritage employees continued contacting glyburide suppliers and other drug competitors to secure agreements to raise prices for glyburide.

48.    Defendants contacted manufacturers who planned to enter the glyburide market to ensure that these incoming entrants would not compete by lowering prices. When Defendant Citron appeared to be gearing up to enter the glyburide market, through its partnership with Aurobindo, a Heritage employee contacted her friend at Citron to discuss its glyburide pricing and bidding strategies. Text

messages sent on June 25, 2014 capture the discussions. Citron eventually entered the market, and Heritage employees had extensive phone, text message, and in-person conversations with Citron employees concerning Citron's glyburide pricing and bidding strategies.

49.    Defendants followed through on their illegal promises to collude. By July 9, 2014, Heritage had successfully increased the prices for glyburide to at least seventeen different customers. When a large national retail chain customer requested a bid on glyburide on July 9, 2014, Teva forwarded the customer's request to Heritage, and a female heritage employee responded by reiterating her understanding of the agreement between Heritage and Teva.

50.    During this time, Malek continued to direct Heritage's employees to communicate with glyburide competitors in order to reinforce the existing agreements on pricing and bidding, and to make new ones.

**Masking the conspiracy and destroying the evidence**

51.    Defendants took several measures to avoid detection.  In-person communications among Defendants were achieved through side meetings at trade association conferences, including those sponsored by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA"), the Generic Pharmaceutical Association ("GPhA"), and by a company called Efficient Collaborative Retail Marketing ("ECRM"), which, according to its website, "schedule[s] private meetings between buyers and sellers" in order to "allow for more direct discussions around common business objectives."  Defendants Citron, Heritage, and Teva, as well as certain of their employees, are members of HDMA.  During these conferences and the accompanying social events, Defendants and other generic drug manufacturers discussed current and future business plans, prices, bids, rebates, and customers. These live meetings provided Defendants with the means and opportunity to discuss and reaffirm existing agreements to fix prices for glyburide without leaving a paper trail.

52.     Defendants' employees also attended private dinners with employees from their competitors, with each night at the invitation of a different company that paid the bill for all the participants.  Defendants' female employees arranged regular "Women in the Industry" meetings and dinners.  These meetups were typically organized by a female sales employee from Heritage who resides in Minnesota. Other meeting participants were typically, but not exclusively, employees of generic drug manufacturers located in Minnesota, or saleswomen residing in the area. During these gatherings, Defendants' representatives met with their competitors and discussed competitively sensitive information, including their respective current and future business plans, prices, bids, rebates, and customers. At least one meeting was held in September 2014, and several others were held in 2015, at the ECRM conference in February (involving Citron and Heritage, among others); in Baltimore in May (involving Citron and Heritage among others); and at the NACDS meeting in August (involving Citron and Heritage, among others).

53.     By the aforementioned in-person meetings and by other means, Defendants camouflaged and concealed their wrongdoing from the public and from the federal and state regulators investigating their illegal activities. Going back to at least 2012, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of their wrongdoing. Specifically, none of the email accounts maintained by Heritage had any company-imposed document retention policy associated with them. Quite the opposite: Heritage executives reminded each other to delete emails reflecting incriminating communications. On June 2, 2015, after it had become public that the Connecticut AG and the DOJ were investigating the industry, Malek sent a text message referring to a certain email. The email he referenced was not produced to the Connecticut Attorney General in response to a subpoena, and plaintiffs believe that the email was, along with other relevant documents, deleted by Heritage.

54.     In addition to actively destroying email evidence, out of a further abundance of caution, Heritage and other Defendants consciously sought to avoid using emails or other forms of

communication that could later be subject to discovery. For example, shortly after a text message exchange between Citron and Heritage employees, in which the two companies agreed to fix and raise prices for glyburide, one Citron employee told her counterpart at Heritage that Heritage employees should not communicate with Citron through email, but instead should call a designated person at Citron if they had any information to share.

55.     Notwithstanding Defendants' attempts to conceal their collusion, the facts have begun to come to light. On December 12, 2016, the DOJ filed criminal informations against Defendants Glazer and Malek.  These informations accused Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate and glyburide, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate and Glyburide sold in the United States." In January 2017, Defendants Glazer and Malek  pleaded guilty in federal court and admitted to conspiring to manipulate prices of glyburide and doxycycline between April 2013 and December 2015.

**Glyburide market susceptibility to price-fixing conspiracies**

56.     The communications between Defendants mentioned above are direct evidence of a conspiracy to violate the antitrust laws. This conspiracy was made possible because the United States generic glyburide market displays various qualities that place it at risk of manufacturer collusion and other anticompetitive behavior. During the class period, the glyburide market exhibited the following risk factors for collusion: (1) high concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product substitutes; and (5) opportunities to conspire; and (6) competitors acting against their economic self-interest.

Concentration in the Market

57.    Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct. The market for glyburide is highly concentrated. Defendants each possess large market shares in their respective markets. During the Class Period the primary competitors for glyburide were Defendants Aurobindo, Citron, Heritage, and Teva.

High Barriers to Entry

58.    Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion. However, when a market has high barriers to entry, new competitors are less likely to enter the market. Accordingly, high barriers to entry facilitate collusive behavior.

59.    The market for generic glyburide has high barriers to entry, including regulatory, intellectual property, and financial hurdles.

60.    All generic drug manufacturers must receive FDA approval prior to marketing and selling products. FDA approval requires, *inter alia*, the preparation and filing of an application, which typically costs at least $1 million.[2]

61.    Further, both state and federal law govern the operation of drug manufacturing facilities. Such costs of doing business are another regulatory barrier to entry for potential competitors.

62.    Intellectual property costs can include acquisition of, and litigation over, patent rights, either through the investigation of whether a drug compound is protected by a valid patent or for establishment of preferred generic treatment under the Hatch-Waxman Act. Transactional costs such as licensing deals can add further layers of costs.

63.    Finally, generic drug makers also incur some research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for real estate and specialized equipment, and

---

[2] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/GottliebGeneric-Drug-Testimony-112014.pdf, at 7.

other corporate financial requirements inherent to the pharmaceutical industry. The small number of competitors in the generic glyburide market during the Class Period reflects these high barriers to entry.

Inelastic Demand

64.     Elasticity of demand is the sensitivity of supply and demand to changes in one or the other.  Perfectly inelastic demand occurs when purchasers would pay anything for a good, such as food or water, which is necessary for survival.  Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they wish knowing, first, that purchasers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

65.     Accordingly, Defendants have been able to reap materially significant profits as a result of colluding in the market for generic glyburide, as the market for the drug displays a price inelasticity of demand.

Opportunities to Conspire

66.     Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete. All Defendants participate in some capacity in GPhA, a leading trade association for generic drug manufacturers and distributors.  The below chart further outlines Defendants' participation in GPhA events:

| Meeting | Meeting Date and Location | Attendees |
| --- | --- | --- |
| 2014 GPhA Annual Meeting | February 19-21, 2014, Orlando, Florida | Aurobindo, Heritage, Teva |
| 2014 GPha CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Heritage, Teva |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |
| 2015 GPhA Annual Meeting | February 9-11, 2015, Miami, Florida | Aurobindo, Heritage, Teva |
| 2015 GPhA CMC Workshop | June 9-10, 2015, Bethesda, Maryland | Citron, Heritage, Teva |
| 2015 GPhA Fall Technical Conference | November 2-4, 2015, Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |

67.    Additionally, as uncovered by the state attorneys' general investigation, Defendants attend industry trade shows and conferences which provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers.

68.    The DOJ's grand jury subpoenas and informations, as outlined in greater detail above, also indicate that communication between Defendants was prevalent. The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[3]

69.    In addition to trade association meetings, Defendants attended customer conferences. For example, the MMCAP holds multi-day conferences throughout the year. Many generic manufacturers attend these conferences. The week following Heritage's May 9, 2014, teleconference to discuss contemplated price increases for glyburide, a number of glyburide competitors met in person to discuss price increase strategy during an MMCAP conference. During that meeting, Heritage and Aurobindo confirmed their agreement to raise prices.

## ANTITRUST EFFECTS AND VIOLATIONS

70.    During the Class Period, Plaintiffs and Damages Class Members purchased substantial amounts of glyburide indirectly from Defendants. Because of Defendants' illegal conduct set forth herein, independent pharmacies have paid, and are still paying, artificially and substantially inflated prices for glyburide.

71.    Plaintiffs and Damages Class Members have sustained substantial losses and resultant damage to their business and property in the form of overcharges. These losses and damages will continue to accrue until the anticompetitive conduct set forth herein ceases. The full amount of such damages will be determined at trial.

72.    These losses are caused directly by Defendants' anticompetitive conduct, which had at least the following effects:

      a.    Price competition in the market for generic glyburide has been artificially restrained, suppressed or eliminated in the United States;

---

[3] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

b.   Prices for generic glyburide have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

c.   Purchasers of generic glyburide have been deprived of the benefit of free and open competition in the market for generic glyburide.

73.   At all relevant times, Defendants sold glyburide within the continuous and uninterrupted flow of interstate commerce. Defendants transmitted invoices, contracts, funds and other forms of business communication throughout this time.

74.   During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic drugs in the United States.

75.   In forming, effectuating and operating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic glyburide sold in the United States. These activities include the following:

a.   Defendants met in person or telephonically to discuss the price of generic glyburide in the United States;

b.   Defendants agreed during those meetings and conversations to charge set prices and otherwise to increase or maintain prices of generic glyburide sold in the United States;

c.   Defendants agreed during those meetings and conversations to fix the price of generic glyburide;

d.   Defendants issued price announcements in accordance with their agreements; and

e.   Defendants actually set prices in accordance with their agreements.

76.   Defendants' anticompetitive behavior allowed them to charge prices higher than what they would have been able to charge otherwise.

77.   Inflated prices for pharmacies purchasing glyburide were a direct, traceable and foreseeable result of Defendants' conspiracy.

78.   Plaintiffs and Damages Class Members purchased generic glyburide from Defendants or their affiliates or co-conspirators at inflated, supracompetitive prices during the period of the conspiracy.

79.   Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 of the Sherman Act, 15 U.S.C. § 1, and the laws of various states.

80.     But for Defendants' anticompetitive conduct, Plaintiffs and Damages Class Members would not have paid these inflated prices. Accordingly, Plaintiffs and Damages Class Members have been injured in their business and property in that they paid more for generic Glyburide than they would have paid in a competitive market.

81.     Plaintiffs bring this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to certify two classes of independent pharmacies, the first under federal antitrust laws and the second under the various state laws detailed in Counts II, III, and IV.

82.     The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and (b)(2) and seeks equitable and injunctive relief. The Nationwide Class is defined as follows:

> All independent pharmacies in the United States (i.e., single pharmacies, ten or fewer pharmacies under common ownership, and chains of ten or fewer physical locations) and its territories who purchased generic glyburide products from as early as April 1, 2014 through at least December 31, 2015. This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased glyburide products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families.

83.     The Plaintiffs also bring this action as a class action under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages under the state antitrust, common law and consumer protection laws of the states listed below (the Indirect Purchaser States).[4] This class is the Damages Class and is defined as follows:

> All independent pharmacies (i.e., single pharmacies, ten or fewer pharmacies under common ownership, and chains of ten or fewer physical locations) in Arizona, Arkansas, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia who purchased generic glyburide products from as early as April 1, 2014 through at least December 31, 2015. This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased glyburide products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families.

---

[4] The Indirect Purchaser States, for purposes of this complaint, are: Arizona, Arkansas, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia.

84.    The Nationwide Class and the Damages Class are referred to collectively herein as the "Class." These class definitions are subject to revision according to further factual developments regarding the nature of the conspiracy and the extent of its price-fixing effects.

85.    There are approximately 22,000 independent pharmacies in the United States, if one counts each location individually (while acknowledging that locations may share common ownership). Due to the widespread nature of the trade or the commerce involved, plaintiffs do not know the exact number of Class members involved; however, plaintiffs believe that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

86.    Although larger chains of pharmacies have clout to negotiate drug purchases with wholesalers, distributors, and in some cases the manufacturers themselves, independent pharmacies are price takers who purchased glyburide from distributors at Defendants' illegally enhanced prices.  Each member of the Class has suffered cognizable damage in that each has dealt with third-party payors that reimburse the pharmacy for less than the increased prices of glyburide, initially or permanently.  Further, each pharmacy has suffered increased inventory losses when any of the affected drugs reach expiration, and must be destroyed or sold at a loss to a discounting firm. Finally, each pharmacy has on some occasion, sold drugs at a loss in order to help struggling customers who cannot afford Defendants' price hikes and cannot risk their health on switching or dropping their generic medications.

87.    Plaintiffs are members of the Class, plaintiffs' claims are typical of the claims of the Class members, and plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and Class members purchased generic glyburide from defendants at artificially maintained, supracompetitive prices established by the actions of defendants in connection with the restraint of trade alleged herein. Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

88.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of complex class action litigation, including antitrust litigation.

89.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

90.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

(a)     Whether defendants and their co-conspirators colluded to fix, raise, maintain, and/or stabilize the price of generic glyburide in the United States;

(b)     Whether defendants violated §1 of the Sherman Act;

(c)     Whether defendants violated the laws of the Indirect Purchaser States;

(d)     The duration of the conspiracy to fix glyburide prices;

(e)     The nature and character of the acts performed by defendants in furtherance of the conspiracy;

(f)     Whether, and to what extent, the conduct of defendants caused injury to plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

(g)     Whether plaintiffs and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

91.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, registration and records requirements for independent pharmacies (computer systems that can track every prescription dispensed to every customer) mean the Class is readily ascertainable.

## COUNT I

**Violation of §1 of the Sherman Act on behalf of Plaintiffs and the Nationwide Class**

92.     Plaintiffs reallege and incorporate by reference all the above allegations as if fully set forth herein.

93.     During the Class Period, defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1, by

artificially reducing or eliminating competition in the market for generic glyburide and engaging in a conspiracy to artificially fix, raise, maintain, and/or stabilize the prices for generic glyburide in the United States.

94.     In particular, defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of generic glyburide in the United States.

95.     In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic glyburide in the United States.

96.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among defendants.

97.     Defendants' conspiracy had the effect of artificially inflating the price of generic glyburide in the United States.

98.     As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the other members of the Nationwide Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.

99.     By reason of defendants' unlawful conduct, plaintiffs and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic glyburide.

100.     As a direct and proximate result of defendants' conduct, plaintiffs and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

## COUNT II

**Violation of State Antitrust Statutes on Behalf of Plaintiffs and the Damages Class**

101.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

102.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic glyburide in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

103.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic glyburide and to allocate customers for generic glyburide in the United States and its territories.

104.    In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic glyburide at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by plaintiffs and members of the Damages Class with respect to generic glyburide provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

105.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic glyburide.

106.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

107.    **Arizona:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for generic glyburide was restrained, suppressed and eliminated throughout Arizona; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. During the Class Period, defendants' illegal conduct substantially affected Arizona commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants entered into

24

agreements in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq*. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401 *et seq*.

108.    **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq*.  During the Class Period, defendants and their coconspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.  Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of generic glyburide at supracompetitive levels.  The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic glyburide.  For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of generic glyburide.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic glyburide has been restrained, suppressed and/or eliminated in the State of California; (2) prices for generic glyburide provided by defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California and throughout the United States; and (3) those who purchased generic glyburide indirectly from defendants and their co-conspirators have been deprived of the benefit of free and open competition.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  As a result of defendants' violation of Cal. Bus. & Prof. Code §16720, plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

109.    **District of Columbia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout the District of Columbia; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic glyburide that were shipped by defendants or their coconspirators, were deprived of free and open competition, including in the District of Columbia; and (4) plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and purchased generic glyburide in the District of Columbia that were shipped by defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic glyburide, including in the District of Columbia.  Class members paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. During the Class Period, defendants' illegal conduct substantially affected commerce in the District of Columbia.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501 *et seq*. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501 *et seq*.

110.    **Iowa:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Iowa; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide.  During the Class Period, defendants' illegal conduct substantially affected Iowa commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened

with further injury. Class members paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1 *et seq*. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

111. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Kansas; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. During the Class Period, defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kan. Stat. §50-101 *et seq*. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101 *et seq*.

112. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Maine; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. During the Class Period, defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.  Accordingly, plaintiffs and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

113.    **Michigan:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Michigan; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq*.  Accordingly, plaintiffs and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771 *et seq*.

114.    **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Minnesota; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected Minnesota commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into

agreements in restraint of trade in violation of Minn. Stat. §325D.49 *et seq.* Accordingly, plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. §325D.49 *et seq.*

115.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Mississippi; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Miss. Code §75-21-1 *et seq.* Accordingly, plaintiffs and members of the Damages Class seek all relief available under Miss. Code §75-21-1 *et seq.*

116.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Nebraska; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct. During the Class Period, defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq.* Accordingly, plaintiffs and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801 *et seq.*

117.    **Nevada:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Nevada; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected Nevada commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq*.  Accordingly, plaintiffs and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010 *et seq*.

118.    **New Hampshire:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout New Hampshire; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected New Hampshire commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1 *et seq*.  Accordingly, plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1 *et seq*.

119.    **New Mexico:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout New Mexico; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected New Mexico commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.*   Accordingly, plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq.*

120.    **New York:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout New York; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected New York commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New York General Business Laws § 340, *et seq.* The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.*

Accordingly, plaintiffs and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq.*

121.  **North Carolina:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.*  Accordingly, plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq.*

122.  **North Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout North Dakota; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq.*

Accordingly, plaintiffs and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01 *et seq*.

123.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Oregon; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Oregon commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Or. Rev. Stat. §646.725 *et seq*.  Accordingly, plaintif0sf and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780 *et seq*.

124.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Oregon; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Oregon commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Rhode Island

General Laws § 6-36-4, *et seq.*  Accordingly, plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11 *et seq.*

125.    **South Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout South Dakota; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on South Dakota commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.*  Accordingly, plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

126.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Tennessee; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*.  Accordingly,

34

plaintiffs and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq.*

127.    **Utah:**    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101*, et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Utah; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.*   Accordingly, plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

128.    **Vermont:**    Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Vermont; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Vermont commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of 9 V.S.A. § 2453, *et seq.*   Accordingly, plaintiffs and members of the Damages Class seek all relief available under 9 V.S.A. § 2465 *et seq.*

129.    **West Virginia:**    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, et seq.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout West Virginia; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on West Virginia commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia Code § 47-18-3, et seq. Accordingly, plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, et seq.

130.    **Wisconsin:**    Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Wisconsin; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid more for generic glyburide and suffered expiration and reimbursement losses higher than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Wisconsin commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §133.01 *et seq*.  Accordingly, plaintiffs and members of the Damages Class seek all relief available under Wis. Stat. §133.01 *et seq*.

131.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid artificially inflated, supracompetitive prices and have suffered monetary losses as a result due to reimbursement lag and drug expirations.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

132.    In addition, defendants have profited significantly from the conspiracy.  Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintifsf and the members of the Damages Class.

133.    Accordingly, plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT III

**Violation of State Consumer Protection Statutes on Behalf of Plaintiffs and the Damages Class**

134.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

135.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

136.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101 *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at noncompetitive and artificially inflated levels, the prices at which generic glyburide were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from plaintiffs and members of the Damages Class.  The aforementioned conduct on the part of the defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was

restrained, suppressed and eliminated throughout Arkansas; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas; (3) plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide. During the Class Period, defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, plaintiffs and the members of the Damages Class seek all relief available under that statute.

137.    **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.* During the Class Period, defendants manufactured, marketed, sold, or distributed generic glyburide in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200 *et seq.*, by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200. The acts, omissions, misrepresentations, practices and nondisclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720 *et seq.*, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720 *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) defendants' acts or practices are unfair to purchasers of generic glyburide in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) defendants' acts and practices are fraudulent or deceptive

within the meaning of Cal. Bus. & Prof. Code §17200 *et seq*.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.  The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the Damages Class to pay supracompetitive and artificially inflated prices for generic glyburide.  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.  The conduct of defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200 *et seq*.  As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

138.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout Florida; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide.  During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq*., and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

139.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." For example, doxycycline prices were so inflated by defendants that at times nearly 90% of the price was attributable to price-fixing rather than costs of raw materials, wages, overhead, and so forth. Defendants had the sole power to set that price, and plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic glyburide because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic glyburide, including their illegal conspiracy to secretly fix the price of generic glyburide at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of plaintiffs and the public. Defendants took grossly unfair advantage of plaintiffs and members of the Damages Class. Defendants are also liable under N.M. Stat. § 57-12-2(D)(10) because they declined business for pretextual reasons in order to allocate market share to co-conspirators, and therefore "offer[ed] goods or services with intent not to supply reasonable expectable public demand." In addition, defendants are liable under N.M. Stat. § 57-12-2(D)(11) because their pretextual statements and cover bids, described above, made "false or misleading statements of fact concerning … prices of competitors or one's own price at a past or future time." Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout New Mexico; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide. During the Class Period, defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class

have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

140. **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic glyburidewere sold, distributed or obtained in New York and took efforts to conceal their agreements from plaintiffs and members of the Damages Class. Defendants and their coconspirators made public statements about the prices of generic glyburide that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic glyburide; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic glyburide were misled to believe that they were paying a fair price for generic glyburide or the price increases for generic glyburide were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic glyburide would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic glyburide would have a broad impact, causing independent pharmacy class members who indirectly purchased generic glyburide to be injured by paying more for generic glyburide than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of patients and independent pharmacies in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3)

plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide. During the Class Period, Defendants marketed, sold, or distributed generic glyburide in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic glyburide in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

141.    **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic glyburide were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic glyburide created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy. Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic glyburide prices were raised, fixed, maintained and stabilized at

artificially high levels throughout North Carolina; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide.  During the Class Period, defendants marketed, sold, or distributed generic glyburide in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers.  During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic glyburide in North Carolina.  Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*., and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

142.    **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, et seq.) Members of the Damages Class purchased generic glyburide for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic glyburide were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic glyburide. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic glyburide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide. Defendants' illegal conduct

43

substantially affected Rhode Island commerce and consumers, including independent pharmacies that serve as a conduit to consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic glyburide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic glyburide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic glyburide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

143.    **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic glyburide price competition was restrained, suppressed and eliminated throughout South Carolina; (2) generic glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide.  During the Class Period, defendants' illegal conduct had a substantial effect on South Carolina commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq.*, and, accordingly, plaintiffs and the members of the Damages Class seek all relief available under that statute.

144.    **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq.* Defendants agreed to,

and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic glyburide were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic glyburide. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic glyburide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic glyburide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic glyburide, likely misled all independent pharmacy purchasers acting reasonably under the circumstances to believe that they were purchasing generic glyburide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### COUNT IV

### Unjust Enrichment on Behalf of Plaintiff and the Damages Class

145.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

146.    As a result of their unlawful conduct described above, defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic glyburide.

147.    Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from the overpayments made by plaintiffs and the members of the Damages Class for generic glyburide manufactured by defendants during the Class Period.

148.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiffs assert this cause of action under the equity precedents of each of the above-listed states Indirect Purchaser States (Arizona, Arkansas, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia).  Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## REQUESTED RELIEF

Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    Defendants have engaged in a combination and conspiracy in violation of §1 of the Sherman Act, 15 U.S.C. §1, and plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.    Plaintiffs and the members of the Class are entitled to recover damages sustained by them, as provided by the state antitrust laws listed in Count II and the consumer protection laws listed in Count

III, are entitled to an injunction under federal antitrust laws, and are entitled to a joint and several judgment in favor of Plaintiffs and the Class entered against Defendants in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.    Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable by jury.

/s/ Alexandra Warren

Alexandra Warren (E.D. Pa. ACW9017)
Jonathan W. Cuneo
Joel Davidow
Peter Gil-Montllor
Blaine Finley
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
Fax: (202) 789-1813
awarren@cuneolaw.com
jonc@cuneolaw.com
joel@cuneolaw.com
pgil-montllor@cuneolaw.com
bfinley@cuneolaw.com

Arthur Bailey
**ARTHUR N. BAILEY & ASSOCIATES**
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
Tel: (716) 664.2967
artlaw@windstream.net


Don Barrett
Katherine B. Riley
**BARRETT LAW GROUP, P.A.**
404 Court Square North
P.O. Box 927
Lexington, MS 39095
Tel: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com

*Attorneys for Plaintiffs Falconer, Halliday's,
Russell's and Southside, et al.*